IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    1:15-CR-333 (MAD) |
| | ) | |
| | ) | |
| v. | ) | **GOVERNMENT'S SENTENCING** |
| | ) | **MEMORANDUM** |
| **SHANE ROBERT SMITH,** | ) | |
| **a/k/a Robert Smith,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**I.    INTRODUCTION**

On August 6, 2015, the defendant, **SHANE ROBERT SMITH, a/k/a Robert Smith**, acquired two machineguns, a silencer, and 120 rounds of Green Tip ammunition from an undercover FBI agent for the stated purpose of "execut[ing] kikes [and] coons."  On April 15, 2016, the defendant pled guilty to one felony count of illegal possession of a machinegun. Although the defendant has attempted to minimize his conduct in his presentence interview, the evidence demonstrates that he was predisposed – and indeed eager – to engage in the offense conduct before his first contact with law enforcement.  Based on all of the facts and statutory sentencing factors, the government asks the Court to impose a sentence within the United States Sentencing Guidelines ("U.S.S.G.") advisory guidelines range.

**II.    FACTUAL BACKGROUND**

The government adopts the facts as set forth in the final Presentence Investigation Report and Addendum ("PSR") filed by the United States Probation Office on August 12, 2016.

In summary, the defendant admitted that, beginning no later than May 2014, he sought to acquire illegal automatic firearms and semiautomatic firearms that he intended to convert into illegal automatic firearms.  ECF No. 18, ¶ 5(a), (h), (r); PSR, ¶ 7(a), (h), (r).  For example, in April

of 2015, the defendant made efforts to acquire a semi-automatic MAC 10 via social media and simultaneously purchased a book called "FULL AUTO Volume Three: Semi-Auto MAC 10 Modification Manual." ECF No. 18, ¶ 7(g), (d); PSR, at 23. The defendant later admitted that he purchased this book "for the purpose of converting a semi-automatic MAC 10 firearm into a fully automatic, illegal MAC 10." *Id*. *See also* PSR, ¶ 18. The defendant also made various postings on social media expressing his interest in "guns, gun smithing, building bombs, knives, guerilla warfare, preserving my race and folk, and destroying the government." ECF No. 18, ¶ 5(c); PSR, ¶ 7(c). *See also* Exhibit A. All of this took place before the defendant's first contact with law enforcement in this case, which occurred on May 1, 2015. ECF No. 18, ¶ 5(a), (h), (r); PSR, ¶ 7(a), (h), (r).

On that date, an undercover agent contacted the defendant via the Russian social media forum VK after observing an April 29, 2015 post on a VK discussion forum that showed the defendant seeking to purchase a Mac 10 firearm. After being contacted, the defendant promptly informed the undercover agent that he was forming a group called the Silent Resistance Army, which he described as "basically militant terrorist" and an offshoot of two white supremacist groups, the Order and the CSA (The Covenant, the Sword, and the Arm of the Lord). ECF No. 18, ¶ 7(g); PSR, at 22-23. During this first encounter, the defendant also stated that he wanted to buy a "civi legal" Mac 10, but said that "what I'm doing is gonna rock and roll it . . . [and] its gonna be used to execute kikes, coons a[n]d get money for the crew." PSR, at 22-23; ECF No. 18, ¶ 7(i). The defendant later admitted that, by "rock and roll," he was referring to fully automatic mode. ECF No. 18, ¶ 7(l).[1]

---

[1] As discussed further below, the defendant now disputes this definition of "rock and roll," and contends that he intended to merely make the gun tactical through modifications such as adding rails and lights. PSR ¶ 17.

On April 15, 2016, the defendant pled guilty to one count of illegal possession of a machinegun, in violation of 18 U.S.C. § 922(o), pursuant to a written plea agreement. The plea agreement, which was executed by the defendant and his attorney, contained a lengthy factual recitation that included many of the facts recounted above, including an express acknowledgement that the defendant's efforts to secure automatic firearms predated his first contact with law enforcement. *See* ECF No. 18, ¶ 5(r); PSR ¶ 7(r). During the defendant's change of plea hearing, the factual basis section of the plea agreement was read aloud, and the defendant admitted under oath that these facts were accurate. ECF No. 24, Transcript at 19:4-7, 19:13-15 (hereinafter "Tr. at __").[2] The defendant's attorney also confirmed that these facts were consistent with his understanding. Tr. 19:8-10.[3] When the defense attorney was asked if he was aware of any viable defenses that could be successfully interposed at trial, he informed the Court that he was not. Tr. 28:4-7. Notwithstanding these admissions, during the defendant's presentence interview with the United States Probation Office, the defendant and his attorney took the position that "there was a strong potential entrapment defense in this case" and that the defendant was "pressured into obtaining automatic weapon[s] by the undercover law enforcement officer." PSR, ¶ 21.

The additional facts included in the Addendum to the PSR provide additional details about the defendant's exchanges with the undercover agent once these discussions commenced. PSR, at 22-24. They show, for example, that when the agent asked the defendant about his ideology and plans, the defendant gave a lengthy response in which he described himself as a "violent type

---

[2] "THE COURT: Mr. Smith, you just heard what the government said they could prove if this case had gone to trial. Is that what you did and what happened in this case? THE DEFENDANT: Yes, ma'am." *Id*.

[3] "THE COURT: Is that also your understanding, Mr. Montgomery? Mr. MONTGOMERY: Yes, it is, your Honor." Tr. 19:4-7. "MR. MONTGOMERY: What was just presented on the record . . . reflects what's in th[e] plea agreement." Tr. 19:13-15.

3

person" with "exceptional" marksmanship and a white nationalist ideology, and stated that "[c]hange would bea [sic] stable area in the country for us whites to inhabit without [t]he rule [of] kikes and a future for white children." *Id.*, at 23. The defendant further stated that he lived by the Fourteen Words[4], and that "I will use anything at my means to make it happen and by any means necessary, I'm not scared to kill." *Id.* at 24. On another occasion, the defendant reached out to the undercover agent to ask if he could obtain "boomers," by which the defendant clarified that he meant "explosives as in c4 or grenades." *Id.* at 24.

The government is attaching as Exhibit A excerpts from the defendant's profile on the Russian social networking site VK as additional evidence relating to the issue of predisposition.[5] Many of the posts contained in Exhibit A predate the defendant's first contact with law enforcement in May 2015, while others occurred after the first contact but may nonetheless be relevant to the Court in evaluating the defendant's claims about entrapment and predisposition.[6]

---

[4] "Fourteen Words" is a common reference to a white supremacist slogan expressed in 14 words: "We must secure the existence of our people and a future for white children."

[5] *See generally United States v. Tutino*, 883 F.2d 1125, 1139 (2d Cir. 1989) (a defendant who invokes entrapment "cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue") (quoting *Sorrels v. United States*, 287 U.S. 435, 451 (1932)).

[6] *See United States v. Cromitie*, 727 F.3d 194, 209 (2d Cir. 2013) ("[W]hat a defendant says after [being] contacted by agents is generally admissible to prove disposition."); *United States v. Brand*, 467 F.3d 179, 192-93 (2d Cir. 2006) (citing *Jacobson v. United States*, 503 U.S. 540, 550 (1992)) (the defendant's ready response to inducement or prompt acceptance of government invitation is sufficient to establish predisposition).

### III. APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

#### a. Statutory Maximum Sentence

The defendant's conviction under Count One of the indictment in Case No. 1:15-CR-333 (MAD) for Illegal Possession of a Machinegun, in violation of 18 U.S.C. § 922(o), subjects him to a maximum term of imprisonment of 10 years pursuant to 18 U.S.C. § 924(a)(2); a maximum fine of $250,000 pursuant to 18 U.S.C. §§ 924(a)(2) and 3571(b)(3); a maximum term of supervised release of 3 years, with a potential additional term of imprisonment of up to 2 years for a violation of the conditions of supervised release pursuant to 18 U.S.C. § 3583; and a special assessment of $100 pursuant to 18 U.S.C. § 3013(a)(2)(A).

#### b. Guidelines Provisions

*Base Offense Level & Adjusted Offense Level*

The government adopts the offense-level computations, criminal-history score, and advisory guidelines range stated in the PSR. Specifically, the government adopts the PSR's conclusion that the base offense level is 18 pursuant to U.S.S.G. § 2L2.1(a)(5). This offense level is increased by 2 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(A) because the offense involved three or more firearms. Therefore, the adjusted offense level is 20.

*Criminal History*

The government adopts the PSR's determination that the defendant's criminal history score is 6 and, accordingly, that he falls within Criminal History Category III. However, the government notes that, under U.S.S.G. § 4A1.3, the Court retains the ability to depart upward if it finds reliable information indicating that the defendant's criminal history category substantially underrepresents the seriousness of his criminal history or the likelihood that he will commit other crimes.

Here, the defendant's criminal history consists of a series of escalating incidents dating from his early youth, many of which do not score as part of his criminal history. For example, several incidents in which the defendant engaged in low-level violent conduct as a juvenile that resulted in orders of protection against him are not reflected in his criminal history category, including an incident where he kicked his grandmother. Likewise, an incident where the defendant radioed a report about a student with a gun on campus does not score for guidelines purposes. Other incidents described by the defendant in his statements to the undercover agent also are not reflected in his criminal history scoring. *See* PSR, at p. 23 ("I threw a black kid off the bleachers in high school and he went into like a coma and I've beat a guy with a bat once for breaking my window lol").

Although these incidents occurred when the defendant was a juvenile, the conduct appears to have grown worse with time, culminating in the defendant's third degree assault conviction for punching his sister and pushing his mother and his third degree criminal mischief conviction for making racist and anti-Semitic graffiti. Taken together, this pattern of conduct may provide a sufficient basis for the Court to conclude that a Criminal History Category of III does not adequately reflect the danger that the defendant will reoffend and, accordingly, could provide a basis for varying upward pursuant to U.S.S.G. § 4A1.3.

*Acceptance of Responsibility*

The PSR recommends that the defendant should receive a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a), which would also make him eligible for an additional one-level reduction for permitting the government and Court to avoid preparing for trial under U.S.S.G. § 3E1.1(b). PSR, ¶¶14-22, 31-32. However, a number of the defendant's statements during his presentence interview appear to be efforts to minimize his conduct. Taken

6

together, these statements call into question whether the defendant has clearly demonstrated acceptance of responsibility for the offense conduct and relevant conduct as required by U.S.S.G. § 3E1.1.  *See* § 3E1.1(a); Application Note 1(A) to § 3E1.1 (acceptance requires "truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable"); Application Note 3 to § 3E1.1 (Admitting responsibility before trial "may be outweighed by conduct of the defendant that is inconsistent with [] acceptance of responsibility.  A defendant is not entitled to an adjustment under this section as a matter of right.").

For example, the defendant admitted in his plea agreement and plea allocution that he had purchased a book "for the purpose of converting a semi-automatic MAC 10 firearm into a fully automatic, illegal MAC 10."  ECF No. 18, ¶ 7(g).  But in his presentence interview, he changed his story, stating that he had purchased the book (which was subtitled "Semi-Auto MAC 10 Modification Manual") for "educational purposes."  PSR, ¶ 18.  He then changed his story again and admitted to the Probation Officer that he intended to modify semi-automatic firearms to make them fully automatic firearms.  PSR, ¶ 18.

In addition, as noted above, the defendant acknowledged in his plea agreement and at his plea allocution that his efforts to obtain fully automatic firearms predated his first contact with law enforcement, but then changed his story during the presentence interview.  *See* PSR, ¶ 21.  The defendant also informed the Probation office that when he talked about his plan to "rock and roll" a semi-automatic firearm, he did not mean to convert it into a fully automatic firearm but rather to modify it by adding rails and lights.  PSR, ¶ 17.  But this conflicts with his admissions in his plea agreement and during his plea allocution.  In addition, the defendant's explanation is inconsistent with his later statement about whether the automatic firearms would be "hard to handle on rock

and roll," ECF No. 18, at ¶ 5(l), and with a variety of other evidence showing that he intended to convert a semi-automatic firearm to an automatic firearm.  The defendant also represented to Probation that his criminal history does not include any episodes of violence, *see* PSR, ¶ 17, when in fact he pled guilty to Assault: 3rd, for an incident in which he admitted punching his sister and having a physical confrontation with his mother.  PSR, ¶ 41.

In short, the government is troubled by what appears to be a pattern of minimizing behavior by the defendant.  While the government does not at this time object to Probation's recommendation to award credit for acceptance of responsibility under U.S.S.G. § 3E1.1(a), we note that the Court may consider the defendant's minimizing conduct in evaluating the sentencing factors set forth in 18 U.S.C. § 3553(a), including the history and characteristics of the defendant.

**GOVERNMENT'S SENTENCING RECOMMENDATION**

The defendant committed a serious criminal firearms offense and did so for the stated goal of starting a militant terrorist group and executing people based on their race and religion.  The evidence in this case, including the defendant's own words, shows that he was predisposed and eager to secure automatic firearms to advance his violent white supremacist ideology before his first contact with law enforcement, and that he responded to the agent promptly and enthusiastically from the outset.  Although the defendant now minimizes his conduct and dismisses his prior statements as puffing, PSR, ¶¶ 15, 19, his efforts to acquire illegal weapons using whatever means were at his disposal provide good reason to take his statements at face value.  Based on all of the information before the Court, the government respectfully requests that the Court sentence the defendant to a term of imprisonment, fine, and term of supervised release within the U.S.S.G. advisory guideline range.  The sentence that the government recommends here is

sufficient but not greater than necessary to comply with the sentencing purposes set forth in 18 U.S.C. § 3553(a)(2).

Respectfully submitted this 26th day of August, 2016.

                  RICHARD S. HARTUNIAN
                  United States Attorney

        By:  */s/ Sean O'Dowd & Solomon Shinerock*
           Sean O'Dowd & Solomon Shinerock
           Assistant United States Attorneys
           Bar Roll Nos. 518067 & 519207